**Below is the Order of the Court.**

**Christopher M. Alston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

---

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re:<br><br>Jason R. Sleater,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-12800-CMA |
| Brian Connorton,<br><br>Plaintiff,<br><br>v.<br><br>Jason R. Sleater,<br><br>Defendant. | Adv. No. 25-01062-CMA<br><br>MEMORANDUM DECISION AND ORDER |

## I. INTRODUCTION

The Court conducted a bench trial in this adversary proceeding on June 22 and 23, 2026. Darren Krattli represented plaintiff Brian Connorton and Marc Stern represented defendant

Jason Sleater. The Court held closing arguments on July 2, 2026, and then took the matter under advisement.

The claims in this case stem from a construction agreement between Mr. Connorton and Mr. Sleater's company, NV Development, LLC ("NV Development"). At trial, Mr. Connorton asserted that Mr. Sleater made false representations to induce him to enter into a contract with NV Development and to make several payments. Mr. Sleater contended that he made no false statements that caused Mr. Connorton to act to his detriment.

For the reasons stated below, the Court finds and concludes that Mr. Sleater did not induce Mr. Connorton to enter into a contract with false statements. However, Mr. Sleater knowingly made false statements to convince Mr. Connorton to make certain payments under the contract on which Mr. Connorton justifiably relied. In reliance on those false statements, Mr. Connorton paid $129,948.72 to NV Development for goods and services that the company never provided. Consequently, the Court will award a non-dischargeable judgment for that amount under 11 U.S.C. § 523(a)(2)(A) in favor of Mr. Connorton and against Mr. Sleater. The Court denies the balance of Mr. Connorton's prayer for relief.

## II. FINDINGS OF FACT

### A. Mr. Connorton Enters Into a Construction Contract With Mr. Sleater's Company.

Mr. Sleater is the sole member of NV Development, a Washington limited liability company with its place of business located in Rathdrum, Idaho. Connorton, LLC, is a Washington limited liability company with its principal place of business located in Kittitas County, Washington. Mr. Connorton is the sole member of Connorton, LLC. *See* Admitted Facts section of Pretrial Order at ECF No. 78 (the "PTO") at ¶¶ 1 and 2.

In April 2021, Connorton, LLC acquired real property commonly located at 25266 N. Lantern Road, Rathdrum, Idaho 83858 ("Connorton Property"). Connorton, LLC acquired the Connorton Property for the purpose of constructing a custom home which was to become the primary residence for he and his wife in their retirement. *Id*. at ¶ 3.

On September 24, 2021, Mr. Connorton entered into a Construction Agreement (“Contract”) as “Owner” with NV Development for the purpose of constructing a new, approximately 3,200 sq. ft. custom single-family home with a finished basement and fully finished residential 40' x 50' shop on the Connorton Property. The estimated contract price was $1,097,778.00. *Id*. at ¶ 4. On September 24, 2021, Mr. Connorton paid NV Development a down payment of $54,888.90 or five percent (5%) of the estimated contract as required by that agreement. *Id*. at ¶ 7. During NV Development's negotiation and performance under the Agreement, Mr. Connorton only interacted with Mr. Sleater as the representative and agent of NV Development. *Id*. at ¶ 6.

The Contract contains a section entitled “Price and Payment.” This section includes the following language:

> Owner agrees to pay NV [Development] for performance of the Work as outlined in the attached Compensation Document (Exhibit “B”), subject to adjustments for changes in the Work as may be agreed to by Owner and NV [Development], or as otherwise may be required under this Agreement (the “Contract Price”). Owner agrees to pay NV [Development] monthly progress payments for *all work completed*. Payments will be due and payable within Ten (10) days of invoice approval by Owner, which shall not be unreasonably withheld.

Trial Exhibits (“Tr. Ex.”) P-1 and D-3 [emphasis added]. The referenced Exhibit “B” includes a section again entitled "Price and Payment” that provides in pertinent part as follows:

> [NV Development] “shall submit to the Owner an application for payment consisting of the portion of the Cost of the Work performed up to the last day of the preceding month along with a proportionate share of [NV Development]’s Fee. Each application for payment shall be accompanied by a written summary of

> invoices for labor and materials for the portion of the Work for which payment is sought and shall identify the proportionate share of [NV Development]'s Fee for which payment is requested.

*Id*. Exhibit B also includes a section entitled "Cost of Work & General Contractor Fee" that defines "Cost of Work" to include, but not limited to, a variety of items. Among the 17 specific items enumerated as "Cost of Work" are "the cost of all materials, equipment and supplies *incorporated* into the Work" and "the cost of all materials, supplies, equipment. Temporary facilities and hand tools not owned by the workers which are *used or consumed in the performance of the Work*…." *Id*. [emphasis added]. Absent from this long list of items is any reference to estimated but not yet incurred costs for materials or supplies. The Contract also contains an integration clause that states the written agreement "supersedes are [*sic*] prior negotiation, representations, or agreements, either written or oral." *Id*.

The upshot of these provisions is that the Contract authorized NV Development to seek payment for services and materials it actually provided to complete the project. Mr. Sleater acknowledges that NV Development promised to submit monthly pay applications to Mr. Connorton with its supporting invoices for labor and material consisting of the portion of the Cost of the Work performed up to the last day of each preceding month. Accordingly, Mr. Connorton expected to be billed each month for the cost of the work plus a fee for the labor and materials provided toward the completion of the work. PTO at ¶ 8.

B. <u>Mr. Sleater Makes False and Misleading Statements About Materials Purchased by His Company for the Construction Project.</u>

After making the down payment, Mr. Connorton paid to NV Development $169,534.05 on or about November 3, 2021, for the first invoice issued by NV Development ("Pay Application #1") and $61,517.14 on or about December 6, 2021, for the second invoice issued

by NV Development ("Pay Application #2"). Mr. Connorton paid a total of $285,940.09 to NV Development under the Agreement, reflecting approximately twenty-six percent (26%) of the total contract price. *Id*. at ¶ 9.

Before NV Development submitted Payment Application #1, Mr. Sleater and Mr. Connorton discussed purchasing lumber for the project. On October 31, 2021, Mr. Connorton sent a text message to Mr. Sleater that inquired: "I read lumber prices are going up should we be buying the siding?" Tr. Ex. D-1. That same day, Mr. Sleater responded: "Hi Brian sorry in [*sic*] my daughter's volleyball tournament. We can do that but siding isn't too bad. Lumber is going up but we are already locked in. *Bought it Tuesday*." *Id*. [emphasis added]. Two days later, Mr. Sleater caused NV Development to submit Payment Application #1 to Mr. Connorton. Tr. Ex. D-6.

Payment Application #1 specifies the materials for which NV Development was seeking payment. The invoice includes the following line items:

| | | |
|---|---|---|
| 003 | Shop package wood/metal | $15,270 |
| 1012 | Framing | $71,350.54 |
| 1013 | Trusses & Sheathing | $25,595.74 |

Tr. Ex. P-8. At trial, Mr. Connorton testified that he believed that NV Development acquired these materials prior to submitting Payment Application #1. He stated unequivocally that Mr. Sleater told him that NV Development was purchasing the lumber and trusses and these materials would be stored in a shop or warehouse owned by NV Development. He testified that he paid the amount requested by Payment Application #1 with the understanding that NV Development acquired those specific items.

Mr. Sleater denied these allegations, testifying that Mr. Connorton knew that NV Development would not purchase these materials until they were actually needed for the project.

The backup documentation for Payment Application #1 includes two invoices from Coeur d'Alene Builders Supply ("CBS"). These two invoices correspond to the line items identified above. At the top right corner of each invoice is the word "QUOTATION" in all caps. At the end of the second invoice are the words, in all caps, "THIS IS AN ESTIMATE ONLY." Tr. Ex. P-9. Mr. Sleater further testified that he never did business with CBS and that he obtained an estimate from that company only because Mr. Connorton wanted him to purchase the materials from CBS. Mr. Sleater claimed that he simply obtained an estimate and that he never placed a deposit or paid any money to CBS.

Mr. Sleater did not elicit testimony from Mr. Connorton that he reviewed the attachments to Payment Application #1, including the CBS invoices. But even if he had seen the invoices from CBS with the words "quotation" and "estimate," Mr. Connorton justifiably relied on Mr. Sleater' representation that he had in fact purchased the lumber and trusses. Mr. Sleater's text message on October 31, 2021, supports Mr. Connorton's testimony that Mr. Sleater told him that the materials had been purchased.

Soon after Mr. Connorton paid Payment Application #1, the relationship between Mr. Connorton and Mr. Sleater deteriorated. Mr. Connorton made calls around town and came to believe that NV Development had not in fact purchased the lumber and trusses. Mr. Connorton decided he would try to obtain evidence that Mr. Sleater lied to him. He contacted Mr. Sleater and told him that Mr. Connorton's wife needed to see proof that NV Development had purchased these materials. Mr. Connorton admitted that these statements were false, because his wife did not care about the cost of the project and had not made any demand for evidence. Mr. Connorton testified that he fabricated the story to induce Mr. Sleater to send him phony documents—and Mr. Sleater took the bait.

On December 3, 2021, Mr. Sleater sent Mr. Connorton Payment Application #2 with a cover email and other documents. Referring to Payment Application #1, he stated that he "attached the proof of payment for the trusses and the deposit on the lumber (there will not be an actual invoice until the lumber is delivered as I have explained) …" Tr. Ex. D-8. The email goes on to say: "You chose to purchase materials up front due to economics and inflation. You paid for the materials." *Id*.

Mr. Sleater testified that he attached to this email copies of two documents that appear to show wire transfers, which constituted the proof of payment referenced in the December 3 email. One document purports to show that NV Development directed Bank of America to wire $50,000 on November 10, 2021, and $60,000 on November 12, 2021, to CDA Builders (aka CBS). At trial Mr. Sleater confessed that *he completely fabricated these documents*. He stated that nothing in these papers is true; he made up the amounts, the descriptions, and all of the numbers that look like confirmation that money was sent by wire.

Mr. Sleater continued to lie about the lumber and trusses. After sending the December 3, 2021, email, Mr. Sleater caused NV Development to terminate the Contract. PTO at ¶¶ 13 and 14. On December 29, Mr. Sleater sent a text message that reads in pertinent part:

> I have explained to you at least 10 TIMES! You paid a DEPOSIT on the lumber, of which *I provided you with the invoice and proof of payment* as you requested previously. I canceled it. It was under my company account. You no longer have lumber or my discounts.

Tr. Ex. D-1 [all caps in original; italics added]. This statement runs counter to his testimony at trial that he never placed any deposit with CBS or any other company for lumber and trusses.

To explain why he sent fabricated evidence to Mr. Connorton, Mr. Sleater testified that Mr. Connorton asked him to create the phony wire transfer papers. While Mr. Connorton

admitted that he falsely told Mr. Sleater that his wife was insisting on documentation, he denied that he asked Mr. Sleater to make up evidence of payment. He noted that if he wanted a fake document to show his wife, there would be no reason to ask Mr. Sleater or anyone else to create it. The Court agrees with Mr. Connorton that Mr. Sleater's story defies logic. The December 29 text from Mr. Sleater confirms that he was falsely asserting that he paid monies to CBS. If Mr. Connorton had asked for phony documents, one would expect Mr. Sleater to have highlighted that fact in the December 3 email, the December 29 text, or in one of the numerous emails and texts exchanged by the parties that are in the record—but he did not. Based on the evidence and the Court's observations of the witnesses, including the contradictory statements of Mr. Sleater, the Court accepts Mr. Connorton's testimony and finds Mr. Sleater's version of events not credible.

By the time he paid Payment Application #2 in early December, Mr. Connorton knew that he could not trust Mr. Sleater and therefore any reliance on the fabricated wire transfer documents or the December 3 email was not reasonable. But based upon the trial exhibits and on the Court's observation of Mr. Sleater at trial, the Court finds that Mr. Sleater is indifferent to the truth and will say whatever needs to be said at any time to accomplish his objectives.

C. Mr. Connorton Demands Return of Some, But Not All, of the Monies He Paid to NV Development for the Project.

After terminating the Contract, Mr. Sleater engaged in unprofessional and sometimes outrageous conduct. He sent myriad texts with crude and lewd language that threatened Mr. Connorton. PTO at 4-5. He filed a lien on the Connorton Property for over $400,000 and demanded Mr. Connorton pay daily damages of $1,500. Mr. Sleater admitted at trial he lacked any contractual right to insist on such payments.

In late January 2022, lawyers for Mr. Connorton sent a letter to NV Development in care of Mr. Sleater. This letter acknowledged that NV Development did provide materials and services under the Contract for which Mr. Connorton was willing to pay. The lawyers noted in the letter that NV Development never provided any proof that NV Development purchased any lumber or trusses, and they demanded return of those amounts Mr. Connorton paid for those items. Tr. Ex. P-17. Counsel demanded NV Development refund at least $140,965.55, representing the materials for which Mr. Connorton had not received proof of payment. *Id.* The implication is Mr. Connorton was not seeking a refund of monies actually paid to subcontractors and vendors for the Project, which amounted to $144,974.54 (which included the 15 percent (15%) Contract Fee added to amounts NV Development paid for services and materials).

The attorneys also suggest in the letter that Mr. Sleater's threat to file a lien (which he did file) came across "as a clumsy tactic meant to bully and intimidate Mr. Connorton into walking away from the monies owed to him." *Id.* The Court agrees—the false lien and the threatening texts constitutes evidence that Mr. Sleater knew he was wrong and went on the offensive to scare Mr. Connorton from seeking return of the payments. Indeed, at trial Mr. Sleater admitted that he was being a bully to Mr. Connorton with his demands for monies he knew he had no right to receive.

Unsurprisingly, Mr. Sleater rebuffed the demand from Mr. Connorton's lawyers and stated he had no intention of refunding any money to Mr. Connorton or releasing NV Development's Claim of Lien. PTO at ¶ 20. Mr. Sleater's intransigence forced Mr. Connorton to file a lawsuit to remove the lien Mr. Sleater placed on the Connorton Property. *Id.* at ¶ 21.

D. Mr. Sleater Files Bankruptcy and Mr. Connorton Commences This Adversary Proceeding.

Mr. Sleater commenced a voluntary case under chapter 7 of the Bankruptcy Code on November 1, 2024. PTO at ¶ 22. This was the third personal bankruptcy case he filed in a one-year period in two different courts (two in Western District of Washington and one in the District of Montana). *Id*. He did not obtain a discharge in either of the prior cases. *Id*. Mr. Connorton timely[1] commenced this adversary proceeding on May 6, 2025. In his complaint, Mr. Connorton asserted the following causes of action:

1. Denial of discharge under 11 U.S.C. § 727 (though not expressly stated in the complaint, specifically subsections (a)(2), (3), (4), and (6)) based on allegations that a) Mr. Sleater, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of estate property, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed his property, within one year before the date of the filing of the petition, and property of the estate after the date of the filing of the petition, b) Mr. Sleater concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which his financial condition or business transactions might be ascertained, and c) Mr. Sleater has, knowingly and fraudulently, in connection with his bankruptcy case, withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to his property or financial affairs; and

---

[1] Pursuant to FRE 201, the Court takes judicial notice that Mr. Sleater and the chapter 7 trustee in the main case entered into several stipulations to extend the deadline for all parties in interest to file complaints under 11 U.S.C. §§523 and 727, with the last stipulation establishing May 6, 2025, as the deadline. *See* Case No. 24-12800 at ECF No. 40.

2. Non-dischargeability of debt under 11 U.S.C. § 523(a)(2)[2] and (6), based on allegations that a) Mr. Sleater obtained money from Mr. Connorton by fraud, to include the promises of performance stated in the Contract, and b) Mr. Sleater's actions constitute willful and malicious injury by him against Mr. Connorton. ECF No. 1.

Mr. Sleater sought to dismiss all claims on summary judgment. The Court granted the motion in part and dismissed causes of action under 11 U.S.C. § 727(a)(2) and (3). Based on the evidence submitted by Mr. Connorton, the Court denied the request to dismiss the section 523(a) claims and the remaining section 727 claims. ECF No. 47.

The parties submitted a pre-trial order, which the Court entered on June 22, 2026. ECF No. 78. That order confirmed Mr. Connorton intended to pursue his claim that the Court should deny Mr. Sleater's discharge under 11 U.S.C. § 727(a)(4)(D) and (a)(6)(C).

On the first day of the trial, counsel for Mr. Connorton announced that they were no longer pursuing the remaining section 727 claims. The Court proceeded to try Mr. Connorton's claims under section 523(a).

## III. CONCLUSIONS OF LAW

A. <u>Jurisdiction and Authority of the Court</u>.

Jurisdiction is vested in this court by virtue of 28 U.S.C. § 157. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J), and venue is proper herein under 28 U.S.C. §1409(a).

Neither party filed a Notice Regarding Final Adjudication and Consent as required by Local Bankr. R. 7012-1(a). At this stage of the litigation, the failure to file the required notice

[2] The complaint stated Mr. Connorton sought non-dischargeability of amounts owed to him under 11 U.S.C. § 523(a)(4) and (6). Mr. Connorton subsequently obtained permission to amend the complaint to state the correct subsection. ECF No. 44.

means the parties are deemed to have consented to this Court entering final orders and judgments. Local Bankr. 7012-1(c); *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 683, 135 S. Ct. 1932, 1947, 191 L. Ed. 2d 911 (2015).

B. Dismissal of the Section 727 Claims.

Pursuant to Fed. R. Bankr. P. 7041, a plaintiff may not simply dismiss claims under section 727 by filing a notice or, like Mr. Connorton, announcing the intention to dismiss the claims in open court at the trial. To comply with the rule, Mr. Connorton must provide notice of his intent to the U.S. Trustee and the chapter 7 trustee. Accordingly, the Court will require Mr. Connorton to file a motion to dismiss the section 727 claims and serve it on the chapter 7 Trustee, the U.S. Trustee, and the Defendant. Mr. Sleater will be afforded an opportunity to request the imposition of terms on Mr. Connorton for forcing Mr. Sleater to defend against these claims up until the day of trial. At the hearing, the Court will determine what, if any, terms and conditions it will set out for the dismissal.

C. Mr. Connorton Is Entitled to a Non-Dischargeable Judgment Against Mr. Sleater for the Amounts He Paid NV Development for Lumber and Trusses Based on the False Representations of Mr. Sleater.

The Bankruptcy Code provides that an individual debtor may not discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). To except debts from discharge under this statute, a creditor has the burden of proof under the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

To prevail on a § 523(a)(2)(A) claim on the grounds of false pretenses or false representation, a creditor must prove that: (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; and (5) the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010).

A debt is excepted from discharge under this section if the creditor actually and justifiably relies upon the debtor's representation. *Field v. Mans*, 516 U.S. 59, 77 (1995). Justifiable reliance is a lower standard than reasonable reliance and looks to "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id*. at 71.

In his summation, counsel for Mr. Connorton asserted that Mr. Sleater made three false statements that give rise to a non-dischargeable judgment. First, he contends that Mr. Sleater lied when he induced Mr. Connorton to enter into the Contract because he knew that NV Development could not and would not perform under the Contract. Therefore, according to Mr. Connorton, he is entitled to a judgment for the entire amount he paid under the Contract.

The record, however, refutes the notion that NV Development never had any intention to perform. The photographic evidence shows substantial work on the Connorton Property, and Mr. Sleater provided proof he obtained several required engineering and environmental plans. Tr. Exs. D-11, 12, 13, 14, and 17. Mr. Connorton's attorneys acknowledged in their January 2022 letter that Mr. Connorton received materials and services under the Contract and was not seeking a refund for those items. Mr. Connorton cannot now demand a non-dischargeable judgment for everything he paid to NV Development.

Second, Mr. Connorton's counsel pointed to another document from Mr. Sleater that appears to be a fabrication and supports a non-dischargeable judgment. With Payment Application #2 delivered on December 3, 2021, Mr. Sleater included a document that purports to show a wire transfer from Bank of America to Axis Excavating for $30,225 on November 19. Tr. Ex. P-10 at p. 118. NV Development's bank statements, however, show that NV Development wired Axis Excavating $28,500 from its Bank of America count on that date. Tr. Ex. P-25 at p. 276. At trial, Mr. Sleater did not admit the wire transfer document was made-up but testified he made a mistake.

It is not entirely clear what mistake Mr. Sleater claims to have made, and it is extremely disturbing if he created another phony document. The discrepancy, however, is minimal. Further, by this time Mr. Connorton had determined that Mr. Sleater was not trustworthy and invoices from Mr. Sleater were likely fraudulent, so he cannot claim he justifiably relied on the document before paying Payment Application #2. At trial, Mr Connorton did not contend that he relied on this document before paying this second invoice. Indeed, he testified that he did not review the December 3, 2021, email from Mr. Sleater that included the Payment Application #2 and backup; he claimed the email went to his wife, and he did not receive it. He cannot assert he justifiably relied on a document he never reviewed. The Court rejects any demand for a non-dischargeable judgment based on another wire payment document that Mr. Sleater may have fabricated after Mr. Connorton determined he could not rely on Mr. Sleater.

Third and finally, Mr. Connorton asserts that Mr. Sleater lied about purchasing lumber and trusses from CBS. Here, the Court agrees with Mr. Connorton and concludes that Mr. Sleater made false representations about buying materials for the project. Several times he told Mr. Connorton that he had paid monies to CBS when he in fact never did. The Contract plainly

states Mr. Connorton would pay for work that had been performed and for materials NV Development purchased. Texts and emails from Mr. Sleater refute his testimony that he told Mr. Connorton that NV Development was not purchasing lumber and trusses even though NV Development was invoicing Mr. Connorton for these materials. As of November 3, 2021, Mr. Connorton had no reason to think Mr. Sleater was unreliable and testified unequivocally that he believed that NV Development had purchased these materials. The Court therefore concludes Mr. Connorton justifiably relied on these false statements of Mr. Sleater. And these false statements damaged Mr. Connorton because he paid NV Development for materials and services that he never received.

The Court calculates Mr. Connorton's damages by adding the amounts for the line items for materials that Mr. Sleater falsely claimed were purchased from CBS. *See* Section II.B, *supra*. These amounts total $112,216.28. Since NV Development also collected a 15 percent (15%) construction fee on these items, the damage caused by Mr. Sleater's fraud comes to $129,948.72. The Court declines to award Mr. Connorton a non-dischargeable judgment for the entire amount he paid to NV Development per Payment Application #1, as he has not advanced sufficient evidence supporting damages. Indeed, he previously acknowledged through his lawyers that he received some value from the remaining work and materials provided by NV Development.

D. Mr. Connorton is Not Entitled to a Non-Dischargeable Judgment Against Mr. Sleater for Willful and Malicious Injuries.

A court may declare a debt for willful and malicious injury to the property of another non-dischargeable. 11 U.S.C. § 523(a)(6). Courts must analyze the willful and malicious

prongs of the dischargeability test separately. *In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir. 2005), *amended*, 2005 WL 843584 (9th Cir. Apr. 11, 2005).

To satisfy the willfulness element, a creditor must prove that the debtor deliberately or intentionally injured the creditor and, that in doing so, the debtor intended not just to commit the act itself but also intended the consequences of the act. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Further, the Court must apply a subjective test in determining the debtor's intent. "[Section] 523(a)(6) renders a debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain." *In re Su*, 290 F.3d 1140, 1144 (9th Cir. 2002).

An injury is "malicious," as that term is used in section 523(a)(6), when it is: "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." Within the plain meaning of this definition, it is the wrongful act that must be committed intentionally rather than the injury itself. *Sicroff*, 401 F.3d at 1106 (citations omitted).

Mr. Connorton failed to demonstrate, or even argue in closing, that Mr. Sleater's conduct met these standards. While the evidence shows Mr. Sleater intentionally made false statements to induce payments from Mr. Connorton, the record does not support the conclusion that Mr. Sleater deliberately intended to injure Mr. Connorton. The Court will dismiss this cause of action.

## IV. ORDER

For the reasons stated above, it is hereby, ORDERED that the Court shall enter a judgment that provides as follows:

A. Judgment in favor of the Plaintiff and against the Defendant on Plaintiff's claim based on 11 U.S.C. § 523(a)(2)(A) in the amount of $129,948.72, plus post-judgment interest at the federal judgment rate;

B. Judgment in favor of the Defendant and against the Plaintiff on Plaintiff's claim based on 11 U.S.C. § 523(a)(6), and the claim will be dismissed with prejudice.

It is further ORDERED that within seven (7) days of the date of this Order, Plaintiff shall file in the Defendant's main case a motion for permission to dismiss his claims based on 11 U.S.C. § 727(a)(4)(D) and (a)(6)(C), note the motion for hearing in accordance with LBR 9013-1 on this Court's first available motions calendar, and serve notice of the hearing on the Defendant, the chapter 7 Trustee, and the U.S. Trustee.

/// END OF MEMORANDUM DECISION AND ORDER ///